```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF OHIO
                          EASTERN DIVISION

Zachary Joshua Popper,          :

        Plaintiff,               :

     v.                          :      Case No.  2:15-cv-1116

Carolyn W. Colvin, Acting        :      JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social Security,        Magistrate Judge Kemp

        Defendant.               :
```

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Zachary Joshua Popper, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for social security disability benefits and supplemental security income.  Those applications were filed on April 8, 2011, and alleged that Plaintiff became disabled on January 1, 2009.

After initial administrative denials of his claim, Plaintiff was given a hearing before an Administrative Law Judge on December 20, 2012, and a second hearing on August 29, 2013.  In a decision dated October 21, 2013, the ALJ issued a decision denying benefits.  That became the Commissioner's final decision on February 5, 2015, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on June 22, 2015.  Plaintiff filed his statement of specific errors on August 26, 2015, to which the Commissioner responded on November 24, 2015.  No reply brief was filed, and the case is now ready to decide.

II.  The Lay Testimony at the Administrative Hearing

Plaintiff, who was 35 years old at the time of the first administrative hearing and who has a GED, testified as follows.  His testimony appears at pages 41-53 and 79-85 of the

administrative record.

Plaintiff testified at the December, 2012 hearing that he had last worked in August of 2010, when he was employed for two weeks at a candle warehouse. He was forced to quit due to pain. He had worked on a part-time basis for a pizza shop earlier that year. Due to severe hip and back pain, he did not look for work afterward. He said those problems also affected his ability to do his basic daily activities and also made it hard for him to concentrate and remember. He had problems sitting or standing for more than half an hour and also had trouble sleeping. He had gotten slightly better since having hip surgery several months before the hearing.

At the second hearing, Plaintiff testified that he still had severe pain despite the surgery. Additionally, his pain medications affected his ability to remember things and to concentrate. He had been experiencing pain of that severity since 2010. At that time, he was taking Dilaudid every six hours. It made him sleepy and dizzy. He could walk without a cane although he had used one for four or five months after his hip surgery. He was still having problems sleeping, although he was able to sleep all night two nights out of three.

As far as physical activities were concerned, Plaintiff said he could sit for about fifteen minutes at a time, stand for half an hour, and walk fifteen to twenty minutes. He was most comfortable lying down. He could care for himself and do some limited household chores such as washing dishes and folding clothes, but he was unable to transfer laundry from the washer to the dryer, to mow the grass, or to run the vacuum. Twice a week, he experienced "bad days" where his medication was ineffective and he had to stay in bed all day.

### III. The Medical Records

The medical records in this case are found beginning on page

343 of the administrative record.  The pertinent records - which, in this case, are only the records concerning Plaintiff's alleged mental impairments - can be summarized as follows.

   The primary record concerning Plaintiff's claimed mental impairment is the consultative report from Dr. Donaldson, a psychologist who conducted a clinical interview on July 7, 2011. Plaintiff told Dr. Donaldson at the outset of the interview that he was applying for disability benefits not only due to back and hip pain but also because he had memory issues, anxiety, and panic attacks.  He said that he found it hard to talk to people in public settings and did not have a good relationship with teachers and other students when in school.  Dr. Donaldson observed that Plaintiff's affect was flat and his mood was agitated.  Eye contact was inadequate.  Plaintiff frequently felt hopeless and worthless and said he was depressed most of the time, had decreased interest in activities, and suffered from insomnia, psychomotor retardation, fatigue, a sense of worthlessness, and lack of concentration.  He was also anxious in social situations and had panic-like symptoms in the past.  Based on the interview, Dr. Donaldson diagnosed major depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia.  He rated Plaintiff's GAF at 45 and found impairments in the areas of maintaining attention and concentration, interpersonal relationships, and dealing with work pressure.  Dr. Donaldson also thought that, if granted benefits, Plaintiff might need help managing his day-to-day and long-range financial affairs.  (Tr. 621-24).

   Two state agency reviewers also commented on Plaintiff's mental impairments.  Dr. Dietz stated that Plaintiff had both affective and anxiety disorders and that he had a marked impairment in dealing with detailed tasks, a moderate impairment in maintaining concentration and attention for extended periods,

a moderate limitation in his ability to work in proximity to others, a moderate limitation in dealing with work stress which would limit him to an environment with flexible production standards and schedules, difficulty in adapting to changes in routine, and a marked impairment in his ability to deal with the public. Dr. Dietz based this assessment not only on Dr. Donaldson's evaluation but the fact that Plaintiff "was tearful at his 3/11 pain mgmt. exam." (Tr. 132-37). Dr. Voyten made essentially the same findings. (Tr. 165-67).

## IV. The Vocational Testimony

Carl Hartung was called to testify as a vocational expert. His testimony begins at page 53 of the administrative record, and, after testimony was taken from the medical expert, resumes again at page 69.

Mr. Hartung first testified that Plaintiff's past employment included work as an injection mold machine tender, a light, unskilled occupation; as a cashier/checker, a light, semi-skilled job; and as a fast food service manager, a job which is usually skilled and light. Because Plaintiff was only an assistant manager, however, Mr. Hartung classified this last position as semi-skilled.

Mr. Hartung, after hearing testimony that Plaintiff was limited to sedentary work, confirmed that someone so limited could not do any of Plaintiff's past work. He was then given a hypothetical question which asked him to identify any jobs which could be done by someone who could do sedentary work and, from a psychological standpoint, had problems getting along with others and with maintaining attention and concentration, and who could do only simple, repetitive tasks without production quotas. Mr. Hartung responded that such a person could not do any other work, either, because the issue with concentration even on simple, repetitive tasks would rule out competitive employment.

V.  The Medical Expert Testimony

Dr. Ronald Kendrick, a physician and board-certified orthopedic surgeon, testified at both administrative hearings. The Court will summarize his testimony from the second hearing since that testimony is more comprehensive.

Dr. Kendrick said that Plaintiff suffered from Legg-Perthes disease of both hips, with the right hip being more severely involved, and also osteoarthritis of the right hip leading to total hip replacement.  He was also status post osteotomy of the left femur.  Dr. Kendrick also testified that the record contained diagnoses of lumbar spondylosis and chrondromalacia of the patellofemoral joints bilaterally.

The ALJ asked Dr. Kendrick for an opinion as to Plaintiff's residual functional capacity as of the onset date of January 21, 2009.  Dr. Kendrick responded that up to the date of surgery, Plaintiff would have been limited to sedentary work with the need to change positions every 45 minutes.  After that, he was limited to less than sedentary work for a period of about six weeks, and then again became capable of sedentary work.  This residual functional capacity, according to Dr. Kendrick, took chronic pain into account.

Dr. Kendrick was then asked about Plaintiff's pain medication.  He said that the dose which Plaintiff was taking fell in the moderate range, and that patients taking that medication usually reported drowsiness and psychological detachment.  Dr. Kendrick did not take those side effects into account in making his determination.  He also said that Plaintiff's description of good days and bad days was typical of patients that Dr. Kendrick had treated who had similar conditions.

VI.  The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 20-

20 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2015.  Next, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the onset date of January 1, 2009.  Going to the second step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including Legg-Perthes disease of both hips; osteoarthritis of the right hip; status post total hip replacement; status post osteotomy of the left femur; lumbar spondylosis; and chrondromalacia of the patellofemoral joints of both knees.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform a full range of sedentary work.  Although that precluded Plaintiff from performing any of his past jobs, the ALJ determined that the medical-vocational guidelines directed a conclusion of "not disabled" for someone of Plaintiff's age, education, and work experience who was limited to sedentary work.  Consequently, the ALJ determined that Plaintiff was not entitled to benefits.

VII.  Plaintiff's Statement of Specific Errors

In his statement of specific errors, Plaintiff raises four issues: (1) the ALJ erred by not finding that Plaintiff had a severe mental impairment; (2) the ALJ erred in his evaluation of Plaintiff's physical residual functional capacity; (3) the ALJ erred in relying on the medical-vocational guidelines when there was evidence of non-exertional limitations; and (4) the ALJ erred

by failing to take the side effects of Plaintiff's medication into account. These issues are evaluated under the following legal standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

      A. <u>Severe Mental Impairment</u>

Plaintiff's first argument is that the ALJ should have determined that Plaintiff's mental impairments, which included major depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia, were severe.  He notes that

these impairments were diagnosed after Dr. Donaldson conducted his consultative examination, and that the state agency reviewers also found that Plaintiff had psychologically-based limitations of function.  However, the ALJ gave almost no weight to any of these opinions, finding instead that Plaintiff had no severe psychological limitations at all.  Plaintiff contends that the ALJ failed to follow the proper regulatory path laid out for evaluating psychological impairments and, in addition, that the ALJ's conclusion about the absence of any severe psychological impairments is not supported by substantial evidence but was based on the ALJ's own lay opinion and his belief that the psychological limitations reported by Plaintiff and found to exist by Dr. Donaldson were within Plaintiff's control.

     The ALJ expressed his views about Plaintiff's mental impairments this way.  He first observed that Plaintiff had never sought mental health treatment.  Next, he characterized Dr. Donaldson's conclusion about Plaintiff's functional limitations as having been based "solely on the claimant's own alleged limitations...."  He gave that opinion little weight because it was only a "snapshot" and because "the 'limitations' he opined are within the claimant's own control."  The ALJ also criticized Dr. Donaldson's opinion as vaguely-worded and not useful for making a function-by-function evaluation.  Last, he also discounted the opinions of the state agency psychologists because "the evidence of record does not adequately support a finding that the claimant's alleged mental impairments are severe.  No treating source has opined that the claimant is impaired or disabled due to mental impairments."  (Tr. 23).  The ALJ made no specific evaluation about the degree of Plaintiff's impairment in the areas of activities of daily living, social functioning, concentration, persistence, and pace, and episodes of decompensation.

The Commissioner defends the ALJ's decision on this point by arguing, first, that all of the reasons given by the ALJ were appropriate bases for rejecting the opinions of all three psychologists, mainly because they all relied on Dr. Donaldson's report, and Dr. Donaldson, in turn, provided only a one-time glimpse into Plaintiff's mental condition and relied exclusively on what Plaintiff told him.  The Commissioner also asserts that the ALJ's failure to follow the special technique used to evaluate mental impairments found in 20 C.F.R. §404.1520a was not error because that technique is used only when a severe mental impairment is present.  Finally, the Commissioner contends that any error in this area was harmless because the ALJ went on to evaluate Plaintiff's residual functional capacity based on his finding that Plaintiff had severe physical impairments.

 Taking these arguments in reverse order, the cases which hold that the failure to find a particular impairment to be severe is harmless error all rely on the fact that, notwithstanding the ALJ's finding that a particular impairment is not severe, the ALJ nonetheless included some limitations arising out of that impairment when determining a claimant's residual functional capacity.  In Maziarz v. Sec'y of HHS, 837 F.2d 240, 244 (6th Cir. 1987), the Court of Appeals rejected a claim that reversible error had occurred when an ALJ failed to find that one of the claimant's alleged impairments (a cervical condition) was severe, reasoning that "[s]ince the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error."  However, when an ALJ fails to consider any limitations which might be caused by non-severe impairments, the ALJ errs. See, e.g., Simpson v. Comm'r of Social Security, 344 Fed.Appx.

181, 190-91 (6th Cir. Aug. 27, 2009)(finding that the ALJ erred by not considering a non-severe mental impairment when making the residual functional capacity finding - the same situation involved in this case); see also Rose v. Comm'r of Social Security, 2015 WL 6735313, *5 (S.D. Ohio Nov. 4, 2015)("[a]s this Court has repeatedly held, the harmless error analysis advanced by the Commissioner is appropriate only when the ALJ properly considered any functional limitations arising from non-severe impairments when crafting his residual functional capacity finding"), adopted and affirmed 2015 WL 7779300 (S.D. Ohio Dec. 2, 2015).  The ALJ did not do that here, so harmless error analysis is not applicable, and the question becomes whether the ALJ's decision that Plaintiff did not suffer from a severe mental impairment is either procedurally or substantively flawed.

 Procedurally, the ALJ committed clear error by not following the technique set forth in 20 C.F.R. §404.1520a.  That regulation provides that an ALJ must determine, first, if there is evidence in the record of a medically determinable mental impairment (§404.1520a(b)(1)); if so, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section." §404.1520a(b)(2).  The technique described in paragraph (c) involves rating the degree of functional limitation in four broad areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  Once that rating is done, the ALJ is in a position to "determine the severity of [the claimant's] mental impairments" (paragraph (d)); one of the possible outcomes of that process is a determination that a mental impairment is not severe.  See paragraph (d)(1).  The structure of this regulation makes it clear that the technique it lays out is to be used in each case where a medically determinable mental impairment is

-10-

present, regardless of whether it is ultimately found to be non-severe. That determination is an outcome of the process, and not a prerequisite to apply it.

The Commissioner's argument to the contrary represents not only a serious misreading of the regulation, but is contradicted by a plethora of case law. See, e.g., Echandy-Carabello v. Astrue, 2008 WL 910059, *3 (D.R.I. March 31, 2008), holding that in a case where the ALJ found a mental impairment not to be severe, "the ALJ's failure to comply with the regulation was error," relying on similar decisions from, *inter alia*, the Courts of Appeals of the Eighth, Ninth, Tenth, and Eleventh Circuits; see also Snyder v. Colvin, 2014 WL 3107962, *3 (N.D.N.Y. July 8, 2014)("When *mental impairments* are at issue, this severity determination (whether there is an abnormality having more than minimal effect on ability to work) is made through application of a 'special technique' set out in 20 C.F.R. § 404.1520a(b)-(e)," citing Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008). The failure to follow this technique may, in some cases - such as where the ALJ finds a mental impairment be severe even though the regulation was not followed - be harmless. See, e.g., Rabbers v. Comm'r of Social Security, 582 F.3d 647 (6th Cir. 2009). However, that is not what happened here, nor does the Commissioner make a harmless error argument concerning the failure to follow the regulatory technique. Rabbers further makes clear that "courts generally should exercise caution in conducting harmless error review in this context," id. at 657-58, and notes that the purpose of the technique is to assist the ALJ in determining if more evidence is needed on the issue of severity and how the consequences of the impairment impact a claimant's ability to work. In this case, the Court cannot, for these reasons, find the error to be harmless, and that is enough to justify a remand.

The Court further finds, however, that the ALJ committed not

-11-

just a procedural, but a substantive, error - that is, that the ALJ's determination that Plaintiff did not have a severe mental impairment is not supported by substantial evidence.  Here, all of the medical evidence contradicted the ALJ's finding.  The ALJ's rationale for rejecting all of those opinions rested on essentially three bases: (1) the consultative examination provided only a "snapshot" view of Plaintiff's mental condition; (2) all of the psychologists relied on Plaintiff's self-report of symptoms; and (3) Plaintiff's symptoms, such as his inability to maintain friendships, were within his control.  There is no basis in the record supporting the last of these conclusions, either as to that or any of the other symptoms which Plaintiff reported and which Dr. Donaldson found to be credible.  Further, all psychological examinations rely to some degree on a patient's self-report of symptoms; that alone cannot be the reason why an ALJ refuses to accept a psychologist's or psychiatrist's opinion. See Keeton v. Comm'r of Social Security, 583 Fed.Appx. 515 (6th Cir. Oct. 14, 2014); Lutz v. Comm'r of Social Security, 2015 WL 1927779 (S.D. Ohio Apr. 28, 2015), adopted and affirmed 2015 WL 5343660 (S.D. Ohio Sept. 15, 2015).  Finally, all consultative examinations, whether psychological or physical, provide a "snapshot" look at a claimant's condition; if that were a proper basis for rejecting those opinions, it would apply in every case.

The proper method for evaluating medical opinions, treating or otherwise, is found in 20 C.F.R. §404.1527(c).  The ALJ's evaluation here did not follow that analytical path and is not supported by the record.  And even if it were a legitimate criticism of Dr. Donaldson's opinion that he did not phrase his conclusions in a way that could be directly converted to vocational abilities, that is not so with respect to the two state agency physicians, nor is it a valid reason for concluding that Plaintiff had no limitations on his ability to function which would impact his ability to do work at any exertional level

- the test for determining if an impairment is severe, see 20 C.F.R. §1521; see also Salmi v. Sec'y of HHS, 774 F.2d 685 (6th Cir. 1985).  On this record, the ALJ's finding that Plaintiff had no severe mental impairment is not supported by substantial evidence, and, as part of the remand being ordered, the ALJ must revisit this issue and engage in a proper evaluation of the opinion evidence.

                B.   Physical Residual Functional Capacity

Plaintiff's next argument points to what he believes to be an inconsistency between the ALJ's adoption of Dr. Kendrick's testimony and the regulatory requirements for sedentary work.  Briefly stated, Dr. Kendrick said that Plaintiff could do sedentary work but would have to adjust positions for at least a minute or two every forty-five minutes.  The ALJ purported to adopt that testimony.  However, in order to do a full range of sedentary work, a person must be able to sit for at least two hours at a time without interruption.  Plaintiff contends that it was error, given the record, for the ALJ to find that he was capable of a full range of sedentary work.

The Commissioner does not dispute either that Dr. Kendrick identified the need for Plaintiff to change positions briefly every 45 minutes or that the ALJ fully accepted that testimony.  The Commissioner argues, however, that Plaintiff has not demonstrated that such a limitation erodes the occupational base for sedentary work, or, if it does, that any error was harmless.  Since the Court should order remand on the first issue, this matter can also be addressed with vocational testimony, although the Court does note that the Commissioner had the burden at step five to show that despite being unable to perform his past work, Plaintiff could still do other jobs, and that it may not have been Plaintiff's burden to show that the limitation on sitting which the ALJ found to exist did not substantially decrease the number of sedentary jobs Plaintiff could perform.

C.  Nonexertional Impairments

In this statement of error, Plaintiff asserts that use of the medical-vocational guidelines was error due to the presence of both physical and mental non-exertional impairments.  This claim is moot in light of the disposition of Plaintiff's first two claims of error.

D.  Side Effect of Medications

Plaintiff's final claim of error deals with the evidence that his medications caused side effects including dizziness, drowsiness, and loss of focus.  Dr. Kendrick testified both that it was common for patients taking Dilaudid to report such side effects, and that his assessment of Plaintiff's residual functional capacity did not take them into account.  Plaintiff argues that under Social Security Ruling 96-8p, an ALJ must consider side effects of medication, and that the ALJ here failed to do so.

SSR 96-8p requires an ALJ to consider, among other factors, evidence of "side effects of medication" in determining a claimant's residual functional capacity.  It also requires an ALJ to provide "a narrative discussion describing how the evidence supports each conclusion" as well as "a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."  The Commissioner concedes that the ALJ's decision - which contains no discussion of side effects or how they either did or did not affect Plaintiff's residual functional capacity - could have been "a little more clear" on this subject.  Response to Statement of Errors, Doc. 17, at 11.  That is an understatement.  The Court does not view the ALJ's observation that Plaintiff was alert and attentive to the proceedings at the administrative hearing, or his reference to the fact that Plaintiff had performed some work activity (although not substantial gainful activity) since his alleged

onset date, to constitute a clear rejection of Plaintiff's testimony as to side effects. Again, a remand will enable the ALJ to consider all of the testimony on this subject and to determine if any functional restrictions (like avoiding hazardous machinery or unprotected heights) are reasonably related to the side effects of Plaintiff's medication.

## VIII. Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

## IX. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge
